# EXHIBIT A

State Court of Fulton County
**E-FILED**
24EV000836
2/9/2024 4:00 PM
Donald Talley, Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

**Robert Minton,**
    PLAINTIFF,

v.

**CITY OF ATLANTA,**

**ATLANTA POLICE DEPARTMENT**,

**OFFICER BALMORE CRUZ**, in his individual capacity,

**OFFICER BRANDON MEADE** in his individual capacity,

**OFFICER JB KARPEH**, in his individual capacity

**OFFICER JOHN DOE** (Supervisor), in his individual capacity (complete name unknown),
    DEFENDANTS.

CIVIL ACTION FILE NO.:

## COMPLAINT FOR DAMAGES

**COMES NOW,** Plaintiff, Robert Minton, in the above-styled civil action, and hereby files this Complaint for Damages and shows the Court as follows:

## NATURE OF THE ACTION

1. This civil lawsuit seeks redress in the form of damages due to a constellation of actions and inactions by the Officers, leading to significant physical injury to the Plaintiff and the issuance of an unfounded citation. It is alleged that these steps were deliberately taken to mask the wrongdoing of an active Atlanta police officer, therefore infringing upon the Plaintiff's civil rights and obstructing justice.

2. Per Georgia statutes, municipal entities and their officials may incur liability for not only the negligent performance of their ministerial duties but also for acts executed with malice or an intent to cause injury under certain circumstances. This claim underscores that the Officers collectively failed to uphold various ministerial obligations essential to the maintenance of public health, safety, and justice.

3. The lawsuit further alleges that the Officers, through acts of commission and omission, have breached the statutory and common law protections afforded to individuals, including the Plaintiff. Specific attention is drawn to actions purported to be disguised as discretionary but, upon closer examination, reveal a pattern of conduct aligned with actual malice or a concrete intention to harm the Plaintiff, thereby invoking a waiver of immunity as encapsulated in OCGA § 36-33-1.

4. Central to this lawsuit is the contention that some of the actions attributed to the Officers, particularly those involving law enforcement officers directly interacting with the Plaintiff post-incident, exceeded the bounds of lawful discretionary function. The officers' decision-making processes and subsequent actions — particularly

## PARTIES, JURISDICTION, AND VENUE

5. Plaintiff Robert Minton at all herein, is a resident of the State of Georgia and can bring this action under Georgia law for all general, special, and compensatory damages allowed. Therein.

6. Mr. Minton is subject to the jurisdiction of this Court.

7. Defendant **City of Atlanta**, at all relevant times to this action, is and was a Municipal Corporation organized and existing under the laws of the State of Georgia. Defendant City of Atlanta is responsible for the supervision and operation of the City of Atlanta Police Department, refer to as APD. City of Atlanta may be served by serving Mayor Andre Dickens through the city of Atlanta Department of Law, 55 Trinity Ave, Suite 5000, Atlanta, GA 30303, venue, and jurisdiction are proper as to defendant City of Atlanta. At all times relevant to this lawsuit, Defendant City of Atlanta acted under the color of law.

8. Defendant **Balmore Cruz** ("Officer Cruz") is an officer employed by the City of Atlanta Police Department (APD). The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Officer Cruz may be served at this address. At all times relevant to this lawsuit, Officer Cruz acted under the color of law. Officer Cruz is sued in his individual capacity.

9. Defendant **Brandon Meade** ("Officer Meade") is an officer employed by the City of Atlanta Police Department (APD). The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Officer Meade may be served at this address. At all times relevant to this lawsuit, Officer Meade acted under the color of law. Officer Meade is sued in his individual capacity.

10. Defendant **JB Karpeh** ("Officer Karpeh") is an officer employed by the City of Atlanta Police Department (APD). The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Officer Karpeh may be served at this address. At all times relevant to this lawsuit, Officer Karpeh acted under the color of law. Officer Karpeh is sued in his individual capacity.

11. Defendant **JOHN DOE** ("Supervisor Doe") is an officer employed by the City of Atlanta Police Department (APD). The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Supervisor Doe may be served at this address. At all times relevant to this lawsuit, Supervisor Doe acted under the color of law. Supervisor Doe is sued in his individual capacity.

12. All actions, omissions, and events complained of herein took place in Fulton County, State of Georgia. Accordingly, venue properly lies in this Court pursuant to O.C.G.A. 50-21-28.

## STATUTE OF LIMITATIONS

13. The collision central to this lawsuit took place on February 15, 2022. Normally, the statute of limitations for such cases, according to OCGA § 9-3-33, spans two years from the date of the incident, setting the filing deadline as February 15, 2024.

14. Officer Meade issued citation and charge #5938962 for a violation of OCGA 40-6-91(b) against the plaintiff. Initially processed by the Atlanta Municipal Court under case number 22TR011056, the Fulton State Court received this case under file number INT-003106-22 on June 14, 2022, with the transfer completing on July 29, 2022, as evidenced by Complaint Exhibit 1.

15. Citations for offenses alleging violations of Georgia's road rules, such as in this case, are treated as criminal misdemeanors according to OCGA 40-6-1. The penalties for violations specified under OCGA 40-6-91(b) are detailed within OCGA 17-10-3, under titles and chapters related to criminal procedure.

16. OCGA 9-3-99 specifies that the statute of limitations pauses from the alleged crime or act's commission date that triggers the tort action until the crime or act's prosecution concludes or terminates, provided this period does not exceed six years.

17. According to OCGA 9-3-99, the statute of limitations is suspended from the date of the alleged criminal act or offense that initiates the tort action until the culmination or termination of its prosecution, provided that this suspension does not exceed six years.

18. The issuance of a traffic citation acts as a pause on the statute of limitations, as was determined in *Beneke v. Parker*, 293 Ga. App. 186 (667 SE2d 97) (2008).

19. On March 20, 2023, the charge and citation against the plaintiff for allegedly darting out into traffic were dismissed in the plaintiff's favor, further detailed in Complaint Exhibit 2.

20. As per the tolling provision within OCGA §9-3-99, the deadline for filing a personal injury lawsuit and any related claims has now been extended to March 20, 2025.

21. This lawsuit is filed within the permissible statute of limitations for this case, considering any applicable tolling periods.

## FACTUAL ALLEGATIONS

22. City of Atlanta provided photographic evidence through an open records request, documenting the incident between the Plaintiff and Officer Cruz with a camera at the intersection. These photographs serve as the basis for the event timeline detailed in this document, with timestamps recorded in hours, minutes, seconds, and milliseconds (HH:MM:SS.sss).

## INCIDENT OVERVIEW

23. On February 15, 2022, the Plaintiff, a completely disabled veteran using a wheelchair, was navigating the pedestrian crosswalk at Centennial Olympic Park Dr NW and John Portman Blvd NW. At this time, a vehicle driven by Officer Balmore Cruz collided with him, causing the Plaintiff significant injuries.

24. Centennial Olympic Park Drive NW features five lanes: four for vehicle traffic and one mixed-use bike lane. For clarity, lanes are numbered 1 to 5 from right to left, following the one-way traffic flow. Lane 1 is adjacent to the curb on the left when facing the direction of traffic. The involved crosswalk is explicitly marked for pedestrian use.



*Figure 1*

## COLLISION TIMELINE

25. **Pre-incident:** Vehicles, including Officer Cruz's, came to a stop at 17:21:49 when traffic lights on Centennial Olympic Park Drive NW turned red.

26. **Incident Initiation**: At 17:21:45.737, the Plaintiff and his spouse started crossing the street, reaching the crosswalk's stop bar by 17:21:57.003. Officer Cruz briefly stopped as the Plaintiff moved past the rightmost street lane, as depicted in Figure 2.



*Figure 2*

27. **Collision**: Officer Cruz accelerated forward at 17:22:00.670, just as the Plaintiff was about three feet from Officer Cruz's vehicle. The collision, occurring at 17:22:01.870, involved two impacts due to the wheelchair's forward motion.



*Figure 3*



*Figure 4*

28. **Post-Collision**: After the collision, Officer Cruz slowed but did not fully stop. He continued to move and turned left onto Andrew Young Boulevard 20.397 seconds post-impact, failing to provide immediate aid to the Plaintiff.

29. The video recording definitively shows Officer Cruz did not halt his vehicle post-collision but proceeded and made a left turn onto Andrew Young Boulevard, 20.397 seconds after starting to move.

30. Officer Cruz's speed at the time of the collision was calculated using digital footage and Google Maps distance measurements with the formula speed = distance/time.

| | Position | Distance (ft) | Start | End | Time (s) | Speed (mph) |
|---|---|---|---|---|---|---|
| 1 | Stop bar to other side of crosswalk | 13.63 | 5:22:00.670 | 5:22.01.770 | 1.100 | 8.45 |
| 2 | To across intersection | 58.57 | 5:22:01.770 | 5:22:03.740 | 1.970 | 20.27 |
| 3 | Start slow down | 46.81 | 5.22.03.740 | 5:22:05.803 | 2.063 | 15.47 |
| 4 | To 'stop' | 151.87 | 5:22:05.803 | 5:22:14.100 | 8.297 | 12.48 |
| 5 | Turn on Andrew Young | 232.53 | 5:22:14.100 | 5:22:21.067 | 6.967 | 22.76 |
| | Total Start to Turn | 503.26 | 5:22:00.670 | 5:22:21.067 | 20.397 | 16.82 (avg) |

## OFFICER MEADE - BODY CAMERA FOOTAGE

31. At 17:45, Officer Meade and Officer Karpeh arrived at the scene in a police van, where they immediately approached Officer Cruz with the question, "What the f**k happened?"

32. Officer Cruz responded, "I was at a red light there, right? And then the green light came on. And he hit me in the back," explaining the moment of collision from his perspective.

33. Officer Cruz expressed confusion about the plaintiff's approach, stating, "No, he came from the side, I guess. I don't even know where he came from. Because he wasn't in front of me. He was in the back."

34. He also addressed accusations against him, saying, "These people, they're saying that I've run over him. You know how it is now, right?"

35. Upon discussing leaving the scene, Officer Cruz mentioned, "And then they say, now, I did when I took off, I kind of stopped here, but then I went around and I was trying to go and get a supervisor and right then to turn, I went over there and tried to get it...." At which point, Officer Karpeh gestured for him to refrain from speaking further about leaving the collision site.

36. Witness Officer Williams, self-identified as "two cars behind him [Officer Cruz]" indicated the collision occurred while, "he [plaintiff] was in the crosswalk when he hit him," and noted Officer Cruz's departure from the scene, stating, "He took off."

37. Officer Cruz later narrated his experience, "Came and stopped and waiting for the light to turn green; turns green, and I take off and all of a sudden feel something. I went and looked at the back mirror, wondering which car hit me, there's no car. Then I move a little bit more, and then look back again and I see him in the wheelchair, he was crossing over and so I continue and go around."

38. Officer Williams confronted Officer Cruz post-incident, telling him, "Hey, you saw, you know you hit that guy back there." Officer Cruz replied, "He hit me because he hit me in the back." Upon Officer Williams suggesting he should have stopped, Officer Cruz informed her, "I'm coming to get a supervisor right now."

39. This admission confirms Officer Cruz's awareness of the collision.

40. This admission to Officer Williams confirms Officer Cruz was aware he had struck a person and subsequently left the scene without checking on the health and wellbeing of the individual involved.

41. View of Officer Cruz vehicle at the time he alleges to slow and location of plaintiff and wife chasing him as Officer Cruz left the scene:



Figure 5



Figure 6

42. At 17:54, Officer Meade reported to an unidentified supervisor over the phone about the video documentation of the incident by the plaintiff and informed them of Officer Karpeh's 'lead' role in the investigation.

43. In response to guidance from the supervisor, Officer Meade expressed his understanding with multiple affirmations: "Really? Okay. Okay. Okay."

44. Following the call, Officer Meade communicated to Officer Karpeh the necessity of issuing a "23" (criminal charge) against the plaintiff to Officer Karpeh, citing the city vehicle's involvement and anticipated plaintiff challenges as pivotal reasons.

45. Officer Karpeh appeared surprised by the mandate for ticket issuance, seeking clarity on why such an action was necessary.

46. Officer Meade explained the supervisor's reasoning was "it's because it's a city vehicle and it's going to look kinda crazy if they [the plaintiff] try to challenge it."

47. Officer Meade acknowledged that the final decision rested with Officer Karpeh, he recommended, "best you do it." Officer Karpeh agreed and asked Officer Meade to write the ticket.

48. Officer Meade then states that the plaintiff is "going to be pissed" and that originally Officer Meade was going to do a "17-2".

49. Officer Meade told Officer Cruz and Officer Karpeh that it was best that Plaintiff get a 23 (criminal charge) since "they [the plaintiff] will challenge it, best to issue."

50. By 18:00, Officers Officer Meade and Officer Karpeh consulted Justia for the specific code section relevant to the case. Together they read code section OCGA § 40-6-91 on Officer Meade's cell phone.

51. Officer Cruz remained informed throughout the investigation, seen discussing the case with Officer Meade and Officer Karpeh and walking around with them the entire time.

52. At 18:01 Officer Meade stated to Officer Cruz and Officer Karpeh he wanted to tell them something later about the situation but "didn't' want to talk about it now," stating, "Man, I thought were was all on the same team, man. Why would you lie about that shit?" Officer Karpeh asked him "You talking about that Vic Unit?" Officer Meade responses yes.

53. At 18:16, Officer Meade informed the Sgt. that Officer Cruz had stopped at a traffic light, which then turned green, and the plaintiff began to move "as the light is green," suggesting that the plaintiff started moving when Officer Cruz was legally proceeding through the intersection. This account contradicts the information provided by all witnesses, including Officer Cruz.

54. Officer Meade further claimed that Officer Cruz continued driving, then allegedly stopped (an action that was not actually observed), stating, "and you can see him stop," and described the plaintiff as being positioned in the middle of the road.

55. When questioned by the Sgt. about the traffic light's color during the incident, Officer Meade asserted that all traffic was moving alongside Officer Cruz. However, upon further questioning—highlighting Officer Cruz's own account of being stopped at a red light initially—Officer Meade altered his narrative, suggesting the verification of the green light came from observing that all other cars were proceeding.

56. To contextualize Officer Meade's statement, video provided by the City of Atlanta shows Officer Cruz was approximately 46.81 feet away from the collision site, 2.063 seconds post-collision. By this point, the plaintiff and his wife had time to approach Officer Cruz, yet no other vehicle is observed moving away from the stop bar:



57. Asked about ticket issuance to a civilian in a similar situation, Officer Meade responded the ticket would go to the pedestrian.

58. Officer Karpeh came over and stated that the plaintiff refused to sign the ticket for being at fault.

59. Officer Meade stated that if the plaintiff refused to sign, the refusal could be noted, implying that "HE [the plaintiff] has to come to the court date, he cannot fight it," leveraging the plaintiff's hospitalization as a factor.

## OFFICER KARPEH - BODY CAMERA FOOTAGE

60. The facts outlined in this section are derived directly from the body camera footage of Officer Karpeh, who was the lead officer to Officer Meade. Timestamps are provided where relevant to support the accuracy of the events described.

61. At 18:12:22, Officer Karpeh entered the ambulance to speak with the plaintiff about the incident.

62. Karpeh acknowledged the plaintiff was injured and mentioned the incident was captured on camera, saying, "But the incident was caught on camera."

63. Karpeh informed the plaintiff he would be deemed at fault for the accident because "The light had changed, right? And you stay proceeded to go in the cross world when you hit the city vehicle."

64. The plaintiff explained he was in the middle of the road and couldn't turn around; Karpeh expressed understanding by listening without disputing this statement.

65. Despite this, Karpeh issued the citation to the plaintiff, stating, "So you're gonna be at fault for the accident, alright? Based on that I have to cite you."

66. The plaintiff argued that anyone observing the scene would have noticed him and that he couldn't turn around, to which Karpeh had no direct counter except to proceed with the citation process.

67. Karpeh reasoned that since Officer Cruz had a green light and the plaintiff was hit in the back passenger side, "So you're going to be at fault for the accident," indicating the plaintiff would receive the ticket.

68. Karpeh acknowledged he was aware the plaintiff was already in the roadway but claimed the plaintiff "kept crossing" when the opposite light turned green, creating a precarious situation, highlighted by his focus on the traffic light status.

69. The plaintiff stated the cross street light was green, implying he had the right of way, "I mean, it was green when I was crossing the street."

70. When the plaintiff questioned if he was correct in his right of way, Karpeh focused solely on the fact that "But if so, he had a green arm in the goal" referring to Officer Cruz having a green light.

71. Karpeh asked the plaintiff to sign the ticket, which the plaintiff refused, expressing frustration, "I'm not signing the report."

72. Karpeh then suggested that refusing to sign the ticket implied the plaintiff did not want an official report made, attempting to coerce the plaintiff into signing by saying, "So basically you don't want me to do the report, you don't want a report."

## SEARGEANT BARTHELMY - BODY VIDEO CAMERA

73. The facts outlined in this section are derived directly from the body camera footage of Sgt. Barthelemy, who was the supervising officer on the scene. Timestamps are provided where relevant to support the accuracy of the events described.

74. At the scene, Sgt. Barthelemy spoke with the plaintiff's wife, introducing himself as a supervisor and inquiring about the events leading to the incident.

75. The plaintiff's wife stated they were legally crossing the crosswalk with the wheelchair when the traffic light indicated their right of way.

76. She described Officer Cruz speeding unexpectedly into the crosswalk while they were still in it.

77. The plaintiff's wife mentioned she shouted the license plate number as Officer Cruz sped away and made a 911 call to report a hit-and-run.

78. At 18:08:10, Sgt. Barthelemy interviewed Officer Cruz, advising him to calm down as Officer Cruz appeared upset.

79. Officer Cruz recounted stopping at a red light in the second lane from the curb and then accelerating when the light turned green, which is when he heard a "boom" but did not see any cars involved in the hit.

80. Officer Cruz said he decided to return to the precinct to report the incident to his supervisor instead of using the car radio, citing it did not occur to him to use the radio at that moment.

81. In a detailed conversation with Anne Williams, Sgt. Barthelmy seeks to clarify the sequence of events concerning the incident involving Officer Cruz:

   a. Sgt. Barthelmy opens the conversation by summarizing the event: "Okay, yeah, so yeah, I'm in Sgt. Barthel. So, dude is sitting at the light. The light is red, right?"

   b. Anne confirms the situation, acknowledging, "[Cruz] takes off, hits the guy," indicating she witnessed the collision.

c.  The Sgt. tries to verify Cruz's actions post-collision, asking, "He goes off the block, you see him stop the call, like on the other street, is that correct or no?" Anne responds, indicating Cruz didn't stop, "So he kept going."

d.  Sgt. Barthelmy seeks to understand Anne's response, "You followed him. And then at what point did you stop him?" He discovers, "So he went all the way up to the precinct."

e.  Detailing the moments at the precinct, "Parallel parked, and then you got up and parked and got out. You asked him, 'why did you, why didn't you stop?'"

f.  Inquiring about Cruz's initial reaction, Sgt. Barthelmy asks, "What's the first thing he said?" leading to the revelation that Cruz claimed, "that dude hit my car," suggesting a level of awareness about the incident.

g.  Expressing incredulity, Sgt. Barthelmy states, "I'm just flabbergasted. You followed him all the way to the precinct. He parallel parked, correct?"

h.  Following up on Cruz's demeanor, "He parked his vehicle, and like nothing happened, right? You got out of your vehicle. You approached him."

i.  Concluding the discussion, Sgt. Barthelmy reflects on the situation with disbelief, "Okay, okay. This is crazy. I'm gonna let you know that's in my house. Oh, I appreciate your handling. Have a good night."

82. At 18:39:10, Sgt. Barthelemy called Lt. Ellis, also known as "Buzz," regarding the hit-and-run incident involving a police officer, initiating the conversation about the incident.

83. Before receiving an answer, Sgt. Barthelemy stated, "Let me cut this stuff off for a second," intending to prevent the recording of the conversation that followed.

84. The recording device was turned off at 18:39:31.

85. This action resulted in the deliberate removal of the record of the conversation.

86. Consequently, no formal writings, reports, or records discussing the incident have been produced or found in response to an open records request.

87. The audiovisual recording devices were not turned back on until 18:51, indicating a lack of recorded interactions or discussions for that period.

88. At 19:05:17, while engaging in a discussion with Faircloth, Sgt. Barthelemy elaborated on the incident leading to the citation, explaining, "Okay, he came to a full stop because the light was red; when it turned green, the guy was already halfway in the section, and then 'Boom!'— yeah, he was; by the way, the guy was cited for being in the crosswalk—yeah, because the light was green." This portion of the conversation serves as proof that the supervisory figures at the scene were fully informed by Officer Cruz, Meade, and Karpeh that the Plaintiff was within the crosswalk at the time of the collision and recognized that Officer Cruz was initially facing a red light. Nevertheless, the decision to issue the citation went ahead unopposed, signifying an understanding of the events while simultaneously showing a disregard for the precise regulations involved.

89. Earlier, at 19:02:24, in a detailed exchange with Faircloth, Sgt. Barthelemy expressed concern over Officer Cruz's actions post-collision. He referenced APD protocols which mandate a complete halt under a 41P scenario, articulating, "But here's the thing. The officer keeps going, leaves the scene." He further contemplated the implications of Officer Cruz's intent to consult a supervisor, suggesting, "Yeah, but at the same time, here's the issue. If he was going to your supervisor, then you already knew something happened." He inferred that the appropriate response from Officer Cruz, upon realizing an incident had occurred, would have been to immediately stop and remain on-site, encapsulating, "You should have just stopped and pulled over if you felt it."

90. In a conversation with the supervising Major, Sgt. Barthelemy expressed his concerns, stating, "It's bothering me; that's why I called you direct, and Cruz is probably going to have to make a statement. The thing about it, had that lady, Anne Williams, not followed him with her own POV, who knows what would have happened? This could have turned out terrible! Who knows?"

## POLICE REPORT AND WITNESS STATEMENTS

91. The police report filed lacks comprehensive detail and has significant omissions about Officer Cruz; it fails to provide Officer Cruz's full name or date of birth, mistakenly using the date of the incident. Instead of Officer Cruz's personal number, the report erroneously lists the police department's contact number while disclosing the personal phone number of a witness officer.

92. There is a discrepancy in the recorded location of the collision, with the report inaccurately claiming it occurred in lane three, though it actually took place in lane two.

93. The report does not properly document the injuries sustained by the Plaintiff and entirely overlooks the eyewitness account from the Plaintiff's wife, who directly observed both the accident and its resulting injuries.

94. The severity of the Plaintiff's injuries, visible as cuts and scrapes indicative of being hit by a vehicle, is both supported and confirmed by the damage observed on Officer Cruz's vehicle, suggesting a collision with the Plaintiff's wheelchair.

95. Moreover, the report neglects to specify the citations given to the Plaintiff, leaving the police report incomplete and seemingly covering up the citation's issuance.

96. In summary, the police report minimizes and omits key information about Officer Cruz's involvement and responsibility in the accident, the exact circumstances of the collision, and the full scope of injuries and damages incurred by the Plaintiff.

## OPEN RECORDS AND DELAYED RESPONSES

97. On February 22, 2022, the Plaintiff filed an open records request with the City of Atlanta.

98. The city responded by letter on February 24, 2022, assigning the request number 22-2858 and indicated a processing time of 30 business days, excluding holidays and weekends.

99. Despite this deadline, the city failed to deliver the requested records within the specified 30 business day period, violating O.C.G.A. § 50-18-71(b)(1)(A).

100. The Plaintiff made a follow-up inquiry on October 13, 2023, well over a year after the original request and months after the dismissal of the citation.

101. The city did not adhere to the initially stated 30 business day processing period in its February 24 correspondence.

102. This breach violated the Georgia Open Records Act, which mandates producing records or supplying a written notice of the delay within 3 days.

103. The requested documents were provided after an additional delay of 1.5 years and the Plaintiff's persistent follow-up actions, occurring after the associated criminal citation's resolution.

## CRIMINAL CITATION AND SUBSEQUENT LEGAL PROCEEDINGS

104. Timeline and Resolution of the Citation:
    a. **Issued**: The "Pedestrian Darting Out in Traffic" citation was issued on March 10, 2022.
    b. **Arraignment**: On June 7, 2022, the Plaintiff, represented by an attorney, pleaded not guilty at the arraignment, leading to the case being bound over to Fulton State Court.
    c. **Bound Over**: The case was officially bound over on June 14, 2022.
    d. **Dismissed**: The criminal proceedings were dismissed on March 20, 2023.

105. Officer Meade decided to issue the citation under subsection (b), ignoring the Plaintiff's right of way as supported by subsection (a) and video evidence of the incident, which (a) states:

"The driver of a vehicle shall stop and remain stopped to allow a pedestrian to cross the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching and is within one lane of the half of the roadway on which the vehicle is traveling or onto which it is turning."

106. Body camera footage showed Officer Meade issuing the citation under subsection (b), despite evidence the Plaintiff was correctly within the crosswalk which (b) reads:

107. "No pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impractical for the driver to yield."

108. This citation was not included in the official police report, raising concerns about the transparency and accuracy of the report, and suggesting an effort to protect Officer Cruz.

109. Officer Meade's police report diagram inaccurately depicted the Plaintiff as stepping directly into traffic, conflicting with video evidence showing the Plaintiff within the crosswalk:



*Figure 7*

110.    The "Pedestrian Darting Out in Traffic" citation was dismissed as "ACFB Resolved" on March 20, 2023, indicating no accusations would be filed for the charges listed.

111.    The Solicitor-General's decision to not pursue charges led to a favorable conclusion for the Plaintiff.

## NOTICE AND ANTE LITEM

112.    Georgia's Tort Claims Act provides the State of Georgia waives its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to O.C.G.A. 50-21-23(a).

113.    The Plaintiff fulfilled the requirements set forth by the Ante Litem Provisions of O.C.G.A. 36-33-5 et seq., necessitating a written notification to the City of Atlanta pertaining to any claims and the specific acts of negligence leading to injury. The incident causing injury transpired on February 15, 2022, and a notice was duly dispatched to the City of Atlanta on March 10, 2022, ensuring compliance within a span of less than 30 days post-incident. Subsequently, on March 28, 2022, the City acknowledged this notice by issuing a written response and assigning the case City Claim No. 22L0103.

114.    Included as part of this Complaint are attached documents: Complaint Exhibit 3, which encompasses a copy of both the initial and updated notices submitted to the City; and Complaint Exhibit 4, which comprises the acknowledgment of receipt from the City of Atlanta. These exhibits serve to verify the procedural diligence observed by the Plaintiff in adhering to the mandatory notification requirements and substantiate the basis for the claims presented herein.

115.    More than 90 (ninety) days have elapsed since the presentation of said claim without resolution by the City of Atlanta.

116.    The above-described motor vehicle collision was proximately caused by Officer Cruz's negligence.

117.    At all times relevant to the litigation, City of Atlanta, was the owner or the supplier of the vehicle driven by Officer Cruz.

## INJURIES SUSTAINED AND MEDICAL TREATMENT RECEIVED

118.    The Plaintiff was hit in both legs and feet, experiencing impact twice, as evidenced in the video, causing him to rotate around.

119.    The Plaintiff was admitted to WS Atlanta Medical Center following the incident.

120.    Upon admission, the Plaintiff had visible scrapes on his legs, but these were not the extent of the injuries sustained.

121.    The diagnosis included a closed fracture of the left ankle, left lateral malleolar fracture, medial malleolar fracture, and trauma.

122.    The Plaintiff underwent multiple medical procedures, including abdominal, DVT/echo, thoracic, renal ultrasounds, and orthopedic injury treatment.

123.    Prior to the collision, the Plaintiff used a wheelchair for mobility due to heart problems, able to walk only very short distances with a cane.

124.    Upon examination, swelling to the left ankle, tenderness, deformity, and signs of injury, along with scattered abrasions to the lower extremities, were observed.

125.    Medical Decision Making (MDM) raised concerns for additional severe injuries, potentially including skull fracture and intracranial hemorrhage among others, leading to numerous imaging procedures such as CT scans and X-rays for comprehensive assessment.

126.    Initial Plan and Interventions included CRITICAL CARE measures, multiple ultrasounds, orthopedic injury treatment, and various X-rays, CT scans covering brain, spinal, chest, abdomen, pelvis, and left lower extremities, alongside other necessary medical orders and procedures.

127.    As a lasting impact, the Plaintiff continues to receive treatment at the VA hospital, facing delayed surgery to the left foot.

128.    Due to the collision and the injuries sustained, particularly to his foot, the Plaintiff can no longer walk and is now entirely dependent on a wheelchair for mobility 100% of the time.

129.    As a direct and proximate result of Officer Cruz's negligence, Plaintiff suffered personal injuries and required medical treatment. Because of these injuries, Plaintiff incurred medical expenses more than $84,266.91 from Atlanta Medical center alone, and other expenses to be proven at trial. Plaintiff has not received the bill from the Veterans Affairs and it is anticipated that the bill will exceed $100,000 given the ongoing treatment, future treatment, and surgery needs.

130.    As a direct and proximate result of Officer Cruz's negligence, Plaintiff sustained physical pain and suffering as well as emotional distress and continues to suffer physical pain and suffering.

131.   As a direct and proximate result of Officer Cruz's negligence, Plaintiff suffered personal injuries and because of these injuries, Plaintiff will incur future medical expenses to be proven at trial.

## FUTURE MEDICAL TREATMENT

132.   The Plaintiff, due to the severity and complications arising from the injuries sustained in the collision, will require ongoing and future medical treatment. This treatment plan includes, but is not limited to, the following components, aimed at addressing both immediate concerns and long-term health management:

133.   **Surgical Interventions:** The Plaintiff requires surgery to address the fracture of the left ankle and associated injuries. Delays in surgery have been attributed to the complexity of the injuries and the need for pre-operative stabilization.

134.   **Rehabilitation Services:** Post-surgery, the Plaintiff will embark on an extensive rehabilitation program. This program will focus on restoring as much mobility as possible and will include physical therapy sessions, occupational therapy, and other modalities to ensure the best possible functional recovery.

135.   **Pain Management:** Given the nature of the injuries and the expected surgical procedures, the Plaintiff will participate in a structured pain management program. This program may include pharmaceutical interventions, physical therapy, and alternative pain management techniques to manage chronic pain effectively.

136.   **Mental Health Support:** The traumatic nature of the incident and the resultant physical limitations impose a significant psychological strain. Counseling and psychological support will be vital parts of the Plaintiff's ongoing care to address issues such as anxiety, depression, and post-traumatic stress disorder (PTSD).

137.   **Long-term Medical Monitoring:** The Plaintiff will require continuous medical monitoring, especially concerning the ankle fracture and potential complications arising from the surgical intervention. This includes regular check-ups, imaging studies, and consultations with orthopedic specialists.

138.   **Adaptive Devices and Mobility Aids:** To accommodate the Plaintiff's increased dependence on a wheelchair and potential limitations following surgery and rehabilitation, adjustments involving adaptive devices and mobility aids will be necessary. These modifications may include wheelchair upgrades, home modifications for accessibility, and the provision of additional mobility aids for short-distance ambulation.

139.   **Continuation of Treatment for Pre-existing Conditions:** Given the Plaintiff's pre-existing heart conditions, ongoing medical care for these conditions will remain imperative. The added stress from the incident and its aftermath may necessitate adjustments to his treatment protocols.

140.   **Prognosis and Future Medical Evaluations:** Regular assessments will be required to evaluate the Plaintiff's progress and make necessary adjustments to his treatment plan. These evaluations will help in addressing any complications promptly and in assessing long-term prognosis and potential for further interventions.

## COUNT 1. OFFICER CRUZ - NEGLIGENCE

141.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

142.    Officer Cruz was negligent in failing to yield the right of way to Plaintiff in violation of OCGA § 40-6-91(a), which states, "The driver of a vehicle shall stop and remain stopped to allow a pedestrian to cross the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching and is within one lane of the half of the roadway on which the vehicle is traveling or onto which it is turning."

143.    Plaintiff was lawfully in the crosswalk at the time of the collision.

144.    Plaintiff had already traversed half the roadway when Officer Cruz accelerated, thereby failing to recognize the Plaintiff's presence and right of way, contradicting the principle that a pedestrian should not suddenly leave a curb and enter the path of a vehicle.

145.    Officer Cruz was negligent in failing to lookout for Plaintiff, thereby neglecting a crucial duty of care owed to pedestrians.

146.    Officer Cruz was negligent in failing to operate a motor vehicle in a safe and lawful manner, exhibiting a reckless disregard for the safety of others, notably the Plaintiff.

147.    Officer Cruz's negligence is the sole and proximate cause of Plaintiff's injuries, directly resulting from his failure to adhere to established traffic laws and regulations.

148.    Plaintiff did not cause or contribute to the incident and was not negligent in any manner, upholding all legal and safety measures applicable at the time of crossing.

## COUNT 2. OFFICER CRUZ - HIT AND RUN

149.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

150.    Officer Cruz committed a hit and run offense in violation of O.C.G.A. § 40-6-270 and by the standards of the APD by failing to immediately stop at the scene of the collision where Plaintiff was injured.

151.    Despite being aware of the collision, Officer Cruz did not stop to render aid, provide his information, or fulfill his legal obligations as mandated by Georgia law.

152.    Officer Cruz's actions in leaving the scene of the collision without adhering to statutory requirements constitute a blatant disregard for the safety and welfare of the Plaintiff.

## COUNT 3. OFFICER CRUZ - FAILURE TO STOP AT THE SCENE OF A COLLISION

153.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

154.    Officer Cruz, by failing to stop at the scene of the collision to provide necessary assistance and information, violated his duty under O.C.G.A. § 40-6-273, which obligates drivers involved in a collision resulting in injury to stop and comply with the requirements therein.

155.   Officer Cruz's decision to leave the scene without fulfilling this obligation highlights a neglect for the legal duties imposed on drivers in the aftermath of a collision, particularly those resulting in injury.

156.   This failure not only deprived the Plaintiff of immediate medical attention that could have been facilitated had Officer Cruz complied with the law but also contributed to the Plaintiff's feelings of vulnerability and distress at the collision site.

157.   The actions of Officer Cruz in failing to stop, render aid, or provide identifying information directly correlate with the additional pain, suffering, and damages experienced by the Plaintiff.

## COUNT 4. OFFICER CRUZ - MALICIOUS PROSECUTION

158.   Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

159.   Officer Cruz knowingly provided false statements and misrepresentations about the incident involving the Plaintiff with the intent to initiate or maintain criminal proceedings against the Plaintiff.

160.   These actions by Officer Cruz led to the unwarranted and baseless issuance of a citation for "Pedestrian Darting Out in Traffic" against the Plaintiff.

161.   At no point did Plaintiff act in a manner that justified this citation, as clearly evidenced by video footage and the eventual dismissal of the charges, which confirms the absence of a factual basis for the criminal accusation.

162.   Officer Cruz acted without probable cause, as he knowingly relayed falsehoods regarding the circumstances of the incident to law enforcement and legal authorities, thereby instigating or continuing criminal proceedings without justification.

163.   Officer Cruz's actions were motivated by malice, as defined within the context of malicious prosecution, reflecting an improper and wrongful use of the legal system to unduly harass, intimidate, or punish the Plaintiff.

164.   Through the footage captured on Sgt. Barthelmy's body camera, it was revealed that Officer Cruz disclosed to Officer Williams his reason for not stopping was that he was "just scared." This admission showcases a fundamental breach of his oath as an officer to safeguard Atlanta's citizens, highlighting that his fear prompted him to lie in an effort to protect himself.

165.   The criminal proceedings initiated based on Officer Cruz's false statements were terminated in favor of the Plaintiff, as evidenced by the dismissal of the citation on March 20, 2023.

166.   As a direct and proximate result of Officer Cruz's malicious prosecution, the Plaintiff suffered significant harm, including emotional distress, reputational damage, and financial losses related to the defense against the baseless charges.

167.   The malicious conduct of Officer Cruz, acting with intent and without just cause, warrants the imposition of punitive damages to deter such behavior and compensate the Plaintiff for the egregious violation of their rights.

168.    Plaintiff seeks compensatory damages for the harm suffered due to Officer Cruz's actions, punitive damages for the malicious nature of the prosecution, legal fees, and any other relief the Court deems just and proper.

## COUNT 5. OFFICER KARPEH - SLANDER/LIBEL

169.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein, highlighting the pivotal reliance on body camera footage and documentation which refute the baseless citation issued against the Plaintiff.

170.    **Falsification in Official Documentation**: Officer Karpeh, in his capacity as an officer of the City of Atlanta Police Department, intentionally and knowingly, wrongfully attributed fault to the Plaintiff in the police report for a violation of OCGA §40-6-91 concerning right of way in a crosswalk. This assertion was not only factually incorrect but also maliciously intended to prejudice the Plaintiff's legal standing and public image.

171.    **Public Dissemination of Falsehoods**: The police report prepared and disseminated by Officer Karpeh, falsely accusing the Plaintiff of a legal infraction that was non-existent per the circumstances of the incident, constitutes an act of libel. This deliberate misrepresentation was made accessible to both public and judicial scrutiny, effectively slandering the Plaintiff in the broader community and amongst legal entities.

172.    **Direct Consequence of False Accusation**: The false statements made by Officer Karpeh resulted in the wrongful initiation of criminal proceedings against the Plaintiff, causing undue emotional distress, reputational damage, and financial burdens related to the defense against these unfounded claims, and ultimately, the dismissal of the citation underscores its baselessness.

173.    **Malicious Intent**: Officer Karpeh's actions, characterized by the fabrication of charges and false documentation of events, were motivated by malice, exceeding the scope of mere negligence. This intent aimed directly to defame the Plaintiff, impugn his character, and misinform the judiciary and the public about the incident.

174.    **Damages**: As a direct result of Officer Karpeh's libelous actions in the official police report and the subsequent slanderous implications thereof, the Plaintiff suffered considerable damages. These include, but are not limited to, the infliction of emotional distress, damage to reputation, incurred legal costs, and potential hindrances to future employability and personal relationships.

## COUNT 6. OFFICER MEADE & OFFICER KARPEH - MALICIOUS PROSECUTION

175.    The Plaintiff realleges and reincorporates herein all foregoing paragraphs, emphasizing the centrality of body camera evidence in showcasing the sequence of events leading to the wrongful citation.

176.    Officers Meade and Karpeh, following Supervisor Doe's instructions, intentionally wrongfully applied O.C.G.A. § 40-6-91(b) in the proceedings against the Plaintiff, aiming to deflect liability away from the city vehicle involved which states: "No pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impractical for the driver to yield."

177. Body camera footage clearly captures Officers Meade and Karpeh consulting Justia.com to identify the appropriate legal justification for issuing a "23" against the plaintiff. Their search led them to OCGA §40-6-91, obliging them to review subsection (a). This subsection mandates that "The driver of a vehicle shall stop and remain stopped to allow a pedestrian to cross the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching and is within one lane of the half of the roadway on which the vehicle is traveling." This directive underscores the expectation for vehicles to yield to pedestrians within crosswalks, a crucial factor given the incident's circumstances.

178. Despite understanding subsection (a)'s requirements, Officers Meade and Karpeh disregarded it, as it conflicted with Supervisor Doe's directive to issue a citation to the plaintiff. This section warranted issuing a citation to Officer Cruz, given unanimous accounts that he was stationary at a red light, and the plaintiff, accompanied by his wife, was already halfway across the crosswalk when the light transitioned. Furthermore, at the moment Officer Cruz initiated movement, the plaintiff was within one lane's distance, only a few feet away, clearly within Cruz's obligation to remain stopped. This choice to overlook subsection (a) highlights a deliberate deviation from the law's stipulations to conform to supervisory instructions at the expense of legal accuracy and fairness.

179. After their review of the law, Officers Meade and Karpeh decided against charging Officer Cruz according to the clear dictates of subsection (a). Contrarily, they opted to cite the plaintiff for "Pedestrian Darting Out in Traffic" based on subsection (b). This application of subsection (b) misconstrued the situation, as it states, "No pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impractical for the driver to yield." Given the circumstances — the plaintiff and his wife were already mid-crosswalk when Officer Cruz proceeded — the use of subsection (b) for the citation did not accurately reflect the incident's dynamics, illustrating a deliberate misapplication of the statute and intent to cite the plaintiff no matter how grounded the charges.

180. When Officer Cruz started moving, the plaintiff and his wife were already across three lanes, which means they didn't suddenly step in front of Cruz's car. Also, there was only 1.2 seconds between Cruz moving and hitting the plaintiff. That's not enough time for anyone to react, especially not enough to stop an electric wheelchair that's already moving. This shows that the reason used to cite the plaintiff didn't match what really happened.

181. Supervisor Doe, and Sgt. Barthelmy's backing of the citation, despite its lack of probable cause, shows an intent to shield Officer Cruz and the city, misusing investigative authority to hinder the Plaintiff's ability to 'challenge' as it "it's going to look kinda crazy if they [the plaintiff] try to challenge it."

182. This strategy led to charges against the Plaintiff, which were devoid of substantial legal grounding and later dismissed, highlighting a case of malicious prosecution intended to protect municipal interests.

183. Officer Karpeh's discussions with the Plaintiff, concerning the city vehicle's involvement and supported by Supervisor Doe's apparent concerns about liability, reveal a calculated effort to obstruct the Plaintiff's challenge. This not only signals an institutional bias against the Plaintiff but also highlights a clear intention by Officer Karpeh to uphold an unfounded citation, demonstrably seeking to protect the city's interests.

184.    The initiation of this citation lacked probable cause, as it was incontrovertibly established that the Plaintiff was lawfully crossing within the designated crosswalk area, opposing the accusation that they had improperly entered the vehicle's path.

185.    The malicious prosecution pursued by Officers Officer Meade and Officer Karpeh, under the misdirection of an unknown supervisor and against the merits of clear, available evidence, culminated in the dismissal of the charges against the Plaintiff, confirming the absence of a factual and lawful basis for the initial accusation.

186.    This wrongful prosecution inflicted significant distress upon the Plaintiff, including emotional harm, reputational damage, and unnecessary financial burdens associated with defending a baseless legal claim.

## COUNT 7. OFFICERS MEADE & OFFICER KARPEH - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

187.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

188.    **Intentional or Reckless Conduct**: The behavior of Officers Officer Meade and Officer Karpeh evidences not only a disregard for Plaintiff's well-being but an apparent endorsement of a "thin blue line" mentality over the pursuit of justice. The video footage capturing interactions and statements among Officers reveals a culture of insularity and a prioritization of departmental solidarity over accountability and public trust. This camaraderie at the expense of justice is inherently reckless displaying a flagrant disregard for the rights and emotional well-being of the Plaintiff.

189.    **Extreme and Outrageous Conduct Enhanced by "Thin Blue Line" Mentality**: Officers' actions, underscored by the embrace of a "thin blue line" culture that implicitly encourages the protection of officers irrespective of their conduct, clearly meets the threshold for extreme and outrageous behavior. Their demeaning of a credible witness (Officer Williams) as a liar to protect their own, and the orchestrated narrative crafted alongside Officer Cruz, underscores a profound breach of ethical obligations owed by law enforcement to the public.

190.    **Pervasive Disregard and Manipulation of Facts**: The manipulation of facts and circumstances surrounding the issue of the unsupported citation, coupled with an intentional effort to diminish the credibility of individuals with dissenting accounts, such as Officer Williams, further amplifies the egregiousness of Officers' conduct. Officer Meade's explicit utterance anticipating Plaintiff's distress, and the collaboration to craft a self-serving narrative, without regard to truth or justice, is emblematic of a systemic problem that facilitated emotional distress.

191.    **Causal Connection Deepened by Sustained Misconduct**: The causal nexus between Officers' conduct and the resulting emotional distress of the Plaintiff is significantly strengthened by the sustained nature of their actions. The pattern of behavior exhibited before, during, and after the incident, including attempts to coerce Plaintiff into signing documents while vulnerable, not only speaks to a moment of distress but to a prolonged campaign of manipulation and emotional torment.

192. **Severity of Emotional Distress Compounded**: The severe emotional distress experienced by Plaintiff is dramatically heightened by the context in which these actions occurred—a context of expected protection and safety turned betrayal. The complexity of being targeted by those sworn to protect, in addition to the physical trauma of the incident, engendered a level of distress that is both severe and enduring, critically impacting Plaintiff's mental health and sense of security.

193. **Conduct Regarded as Utterly Intolerable**: In conclusion, Officers Officer Meade, and Officer Karpeh's conduct, especially when considered within the ethos of the "thin blue line" that seeks to protect officers from accountability at all costs, bears no place in civil society. It is behavior that grossly transgresses the bounds of decency expected from law enforcement and directly contravenes the public trust placed in these institutions and individuals. Hence, their actions are not only intolerable but demand redress and punitive measures to affirm the principle that no entity or individual is above the law.

## COUNT 8. OFFICERS MEADE, KARPEH, AND SUPERVISOR JOHN DOE - VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

194. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

195. **Action Under Color of State Law**: At all relevant times, Officers Officer Meade, Officer Karpeh, and John Doe were acting under color of state law in their capacities as officers of the City of Atlanta Police Department.

196. **Conspiracy to Deprive Constitutional Rights**: Officers Officer Meade, Officer Karpeh, and John Doe conspired among themselves and with others, to deprive Plaintiff of his constitutionally protected rights under the guise of enforcing traffic laws and city policies. This conspiracy was initiated by John Doe Supervisor's directive to issue an unwarranted criminal citation to the Plaintiff, knowing it was based on an incorrect application of the relevant statutes, with the intent to protect the city's interests and make it difficult for the Plaintiff to challenge the officers' actions.

197. **Proximate Cause of Deprivation**: As a direct and foreseeable result of Officers' conspiracy and actions, Plaintiff was deprived of his constitutional rights, including, but not limited to:

    a. **First Amendment Rights**: Plaintiff's right to free speech was violated through retaliatory action for his attempts to truthfully describe the incident and assert his legal rights.

    b. **Fourth Amendment Rights**: Plaintiff was subjected to an unlawful seizure through the baseless issuance of a criminal citation and potentially false arrest, lacking probable cause and grounded in Officers' malicious intent, rather than objective law enforcement needs.

    c. **Fourteenth Amendment Rights**: Officers' actions deprived Plaintiff of due process and equal protection under the law, applying legal standards inappropriately, and discriminating against Plaintiff through punitive legal actions without just cause.

198.    **Malicious and Willful Misconduct**: Officers Officer Meade, Officer Karpeh, and John Doe acted with malice, intentionally targeting Plaintiff for unfavorable legal treatment, and using their authority to manipulate legal outcomes detrimentally against Plaintiff, without regard for the truth or Plaintiff's constitutional protections.

199.    **Damages**: As a result of Officers' actions, Plaintiff suffered various damages including emotional distress, violation of his constitutional rights, reputational harm, and incurred unnecessary legal expenses.

## COUNT 9. OFFICERS MEADE, KARPEH, AND SUPERVISOR JOHN DOE - CONSPIRACY TO OBSTRUCT JUSTICE UNDER 42 U.S.C. § 1985

200.    Plaintiff realleges and reincorporates by reference all preceding paragraphs as if fully set forth herein.

201.    **Action Under Color of State Law**: Officers Meade, Karpeh, and Supervisor John Doe, at all relevant times, were acting within their official capacities, under the color of state law, as representatives of the City of Atlanta Police Department.

202.    **Conspiracy to Obstruct Justice**: Officers Meade, Karpeh, and Supervisor John Doe engaged in a concerted effort with each other, and potentially with unnamed parties, to obstruct justice by issuing a citation under false pretenses. This conspiracy aimed to shield Officer Cruz and the city from liability, knowingly violating the Plaintiff's constitutionally protected rights by misapplying traffic statutes contrary to clear legislative intent and established facts.

203.    **Actions Leading to Constitutional Deprivations**: The conspiracy directly resulted in several violations of the Plaintiff's constitutional rights, including:

   a. **First Amendment Rights**: The conspiracy led to acts of retaliation against the Plaintiff for exercising his right to free speech when he attempted to articulate the incident accurately and assert his legal rights.

   b. **Fourth Amendment Rights**: The Plaintiff was subjected to unfounded legal penalties through the issuance of an unjust citation, constituting an unlawful seizure that lacked probable cause, orchestrated under the officers' directed malice.

   c. **Fourteenth Amendment Rights**: The collaborative actions undertaken by the officers unreasonably deprived the Plaintiff of due process and equal protection, misapplying legal standards to detrimentally single out the Plaintiff without justified cause.

204.    **Malicious Intent and Willful Disregard**: Officers Meade, Karpeh, and John Doe's collective actions toward the Plaintiff were characterized by malicious intent, aiming to manipulate and exploit their official capacities for the specific purpose of disadvantaging the Plaintiff and skewing legal proceedings against him, disregarding the integrity of the legal process and the Plaintiff's rights therein.

205.    **Damages Incurred from Conspiracy**: This orchestrated misuse of legal authority inflicted considerable harm upon the Plaintiff, manifesting as emotional and psychological distress, tarnishment of personal reputation, violation of fundamental rights, and the accumulation of financial expenditures necessitated by the defense against baseless legal actions.

## COUNT 10. CITY OF ATLANTA - **VICARIOUS LIABILITY**

206.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

207.    Officer Cruz was acting within the scope of his employment with the Atlanta Police Department and the City of Atlanta, or for the betterment or furtherance of the interests of the Atlanta Police Department and the City of Atlanta.

208.    Video evidence from Sgt. Barthelmy is clear that Officer Cruz was "on duty", in uniform, in a city owned vehicle at the time of the collision.

209.    The Atlanta Police Department and the City of Atlanta are responsible for Officer Cruz's actions under the doctrine of respondeat superior, agency, or apparent agency.

210.    The Atlanta Police Department and the City of Atlanta are responsible for Officer Meade, Karpeh, Supervisor John Doe, actions under the doctrine of respondeat superior, agency, or apparent agency.

## COUNT 11. CITY OF ATLANTA - **NEGLIGENT ENTRUSTMENT**

211.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

212.    The injuries, harm, and damages incurred by the Plaintiff resulted from the use of the vehicle by Officer Cruz in a negligent and reckless manner. The Atlanta Police Department and City of Atlanta knew or had reason to know, due to Officer Cruz's youth, inexperience, and prior actions, he was likely to involve an unreasonable risk of harm to others while operating a vehicle.

213.    The Atlanta Police Department and the City of Atlanta had the right to permit and the power to prohibit the use of the vehicle by Officer Cruz.

214.    The Atlanta Police Department and the City of Atlanta knew or had reason to know that Officer Cruz, because of his youth, inexperience, and/or prior actions, was likely to operate the vehicle in a negligent and reckless manner.

215.    As a direct result of the Atlanta Police Department and City of Atlanta's negligent entrustment of Officer Cruz with the vehicle, the Plaintiff suffered injuries, damages, and harms previously enumerated in this Complaint without any contributory negligence on their part.

216.    The Atlanta Police Department and the City of Atlanta are held responsible for Officer Cruz's actions under the doctrine of negligent entrustment.

## COUNT 12. CITY OF ATLANTA - **NEGLIGENT TRAINING AND SUPERVISION**

217.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

218.    At all relevant times, Officers City of Atlanta and the Atlanta Police Department (APD) had a duty to properly train and supervise their police officers, including Officers Officer Cruz, Officer Meade, and Officer Karpeh, in the appropriate and lawful conduct of their duties, particularly concerning traffic stops, arrests, issuance of citations, and interactions with individuals with disabilities.

219.    The City of Atlanta and the APD failed in their duty to provide adequate training and supervision with respect to:

   a. Adhering to lawful procedures and statutes, specifically including the correct application of codes during traffic stops and the issuance of citations, thereby ensuring actions taken by officers are supported by law;

   b. Respecting the rights and safety of civilians during encounters, particularly emphasizing the need to stop as required in procedures like the 41P scenario faced by Officer Cruz;

   c. Recognizing and upholding the principles protecting freedom of speech, avoiding unlawful retaliatory actions that could be perceived as endorsing a "thin blue line" mentality; and

   d. Proper interaction with individuals with disabilities in line with the Americans with Disabilities Act (ADA), ensuring such individuals' rights are not violated during police encounters.

220.    The lack of proper training and supervision directly resulted in the unlawful and unconstitutional actions taken by Officers Officer Cruz, Officer Meade, and Officer Karpeh against the Plaintiff, resulting in violations of the Plaintiff's constitutional rights.

221.    The City of Atlanta and the APD's failure to train and supervise their officers amounts to deliberate indifference to the rights of individuals like the Plaintiff, leading to a predictable pattern of unconstitutional behavior.

222.    As a direct and foreseeable consequence of this failure, Plaintiff suffered damages, including but not limited to, emotional distress, unjustified legal entanglement, and violations of his civil rights and rights under the ADA.

## COUNT 13. CITY OF ATLANTA - VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT (ADA)

223.    Plaintiff realleges and incorporates herein the allegations contained above as if fully restated.

224.    Plaintiff, who utilizes a wheelchair for mobility and experiences seizures, qualifies as a person with disabilities under the definitions provided by the Americans with Disabilities Act (ADA).

225.    On or about the incident date, following a collision which is the subject matter of this lawsuit, Plaintiff experienced not only physical harm from the collision itself but also suffered a seizure shortly thereafter - a fact known to Officers as evinced by their recorded conversations on the body camera video footage.

226.    Despite clear knowledge of Plaintiff's post-collision seizure and his use of a wheelchair, Officers City of Atlanta, and the Atlanta Police Department, as well as individual Officers Officer Cruz, Officer Meade, and Officer Karpeh, failed to provide the necessary accommodations for Plaintiff or modify their interview and interaction procedures to account for his disability.

227.    The failure to accommodate Plaintiff's disability during the post-collision interview and interaction significantly impeded his ability to communicate effectively and to understand the process he was being subjected to, thereby exacerbating the distress and confusion experienced during an already traumatic situation.

228.    Such failure demonstrates a disregard for the protection and accommodations mandated by the ADA for individuals with disabilities, especially in critical and vulnerable situations necessitating law enforcement interaction.

229.    Officers City of Atlanta and the Atlanta Police Department are further liable for the ADA violations due to their failure to adequately train their officers in ADA compliance, particularly in recognizing when an individual with a disability requires accommodation and how to adjust law enforcement procedures accordingly.

230.    The actions and omissions of Officers not only directly infringed upon Plaintiff's rights under the ADA but also manifested in a substantial violation of his dignity, autonomy, and right to fair treatment.

231.    As direct and proximate results of Officers' violations of the ADA, Plaintiff suffered damages, including but not limited to, emotional distress, exacerbated trauma from the collision, and a hindrance in the safeguarding of his legal rights during the post-collision interaction with law enforcement.

## COUNT 14. CITY OF ATLANTA - VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

232.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein, detailing not only the specific incident involving Plaintiff and Officers actions but also suggesting a pattern or policy of behavior that encouraged or permitted such actions.

233.    **Action Under Color of State Law**: The actions causing harm to the Plaintiff were conducted by officers of the Atlanta Police Department, employees of the City of Atlanta, acting under color of state law during the performance of their official duties.

234.    **Policy or Custom Leading to Violation**: The City of Atlanta and the Atlanta Police Department are liable for the deprivation of Plaintiff's constitutional rights as these were caused by a policy, custom, or practice sanctioned, tolerated, or indifferently maintained by the municipal entity. The supervisor's directive to issue a citation against the Plaintiff "because it was a 'city vehicle'" and to make it challenging to "challenge" the actions of the officers indicate a policy or practice within the Atlanta Police Department that prioritizes protection of the department's interests or municipal interests over individuals' constitutional rights.

235.   **Widespread Practice Constituting Tacit Policy**: The statements captured on video and the supervisor's directives reflect not merely isolated decisions but are indicative of a wider practice within the Atlanta Police Department — a practice that seems to encourage or necessitate less stringent adherence to constitutional obligations when city interests are perceived to be at stake. Discovery is expected to reveal the extent to which this approach is pervasive and represents a tacit policy of the Department and City.

236.   **Failure to Train, Supervise, or Correct**: Additionally, the City of Atlanta and the Atlanta Police Department failed to properly train, supervise, or rectify practices by their officers that led to violations of constitutional rights. The incident with Plaintiff is expected to be demonstrative of a broader failure by the municipality to ensure that its officers respect the constitutional rights of individuals, thereby constituting a failure of municipal responsibility.

237.   **Proximate Cause**: The policy, custom, or lack of appropriate oversight by the City of Atlanta and the Atlanta Police Department proximately caused the violation of Plaintiff's rights. The actions and directives that led to the issuance of the unfounded criminal citation against Plaintiff directly resulted from this problematic culture and policy approach within the PD and city government.

238.   **Damages**: As a direct and foreseeable result of the City and Department's maintenance of these harmful policies and customs, Plaintiff suffered emotional distress, violation of constitutional rights, reputational harm, and incurring unnecessary legal expenses.

## COUNT 15. ALL DEFENDANTS - PUNITIVE DAMAGES

239.   Plaintiffs incorporate by reference all allegations stated in the preceding paragraphs of this Complaint.

240.   **Entitlement to Punitive Damages Under State and Federal Law**: Pursuant to the provisions under both Georgia law (e.g., OCG.A. § 51-12-5.1) and applicable federal law for civil rights violations, specifically under the guidelines established by Smith v. Wade, 461 U.S. 30 (1983), the Plaintiff asserts entitlement to punitive damages due to the Officers' egregious conduct. This conduct, constituting willful misconduct, malice, fraud, wantonness, and oppression, not only violates the Plaintiff's rights but also appears purposefully directed to shield both an offending officer within their ranks and the City of Atlanta from potential ramifications of such actions.

241.   **Egregiousness of Officers' Conduct**: The actions and inactions of the Officers, as fully delineated in the factual allegations of this Complaint, exhibit a degree of recklessness and a wanton disregard for Plaintiff's statutory and constitutional rights. This behavior showcases:

   a. **Willful Misconduct and Malice**: The Officers knowingly engaged in actions intended to suppress the Plaintiff's lawful expression of his rights as part of a retaliatory scheme, demonstrating a clear objective to infringe upon the Plaintiff's rights.

   b. **Fraud**: Intentional misrepresentation of facts and law to the Plaintiff and in official records, aiming at misleading legal and public scrutiny.

   c. **Wantonness**: Flagrant disregard for the Plaintiff's well-established rights, highlighted by their conduct both at the scene of the incident and during subsequent interactions.

    d. **Oppression**: The systematic imposition of undue pressure on the Plaintiff, an abuse of power given their authoritative roles.

    e. **Complete Lack of Care**: A profound indifference to the impact of their actions on the Plaintiff's health, legal rights, and overall welfare.

242.   **Presumption of Conscious Indifference to Consequences**: The pattern of behavior exhibited by the Officers reveals a willful disregard for the Plaintiff's rights, characterized by a conscious indifference to the outcomes of their misconduct on the Plaintiff.

243.   **Deliberate Intention to Inflict Harm**: Evidence strongly indicates that the Officers acted with an explicit intent to harm the Plaintiff, warranting punitive actions. This intent was driven by a desire to protect another officer and the City from any negative consequences, further emphasizing the malice behind their actions.

244.   **Purpose of Punitive Damages**: Given the Officers' egregious and deliberate infringements upon constitutional and statutory rights—all carried out to defend one of their own and prevent negative fallout for the City—punitive damages are necessary. Such compensation aims to reprimand the Officers for their offensive actions and function as a deterrent against future misconduct by these or similar parties.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff pray that this Court issue the following relief:

1. That process issue in accordance with the law;

2. That the Court grant a jury trial on all claims so triable;

3. Award Plaintiff compensatory, punitive, consequential, emotional and pain damages in an amount to be determined at trial;

4. Award attorneys' fees and costs of litigation in an amount to be determined;

5. Grant such other relief as the Court deems proper.

Submitted Friday, February 9, 2024.

GEORGIA TRIAL ATTORNEYS AT
KIRCHEN & GRANT, LLC

Cody Randall
Georgia Bar No. 609552
Attorney for Plaintiff

*permission Mark Kirch 11000T*

6825 Jimmy Carter Boulevard Ste 1400
Norcross, GA 300711266
Firm Phone: (678) 667-8965
Attorney Email: CRandall@8334thewin.com
**Electronic Service Email: GAEfile@8334thewin.com**

## 22TR011056 - CITY OF ATLANTA vs. MINTON, ROBERT

### SUMMARY

| | | |
|---|---|---|
| Judge: | Case Type: TRAFFIC | Status: CLOSED |
| Case Number: 22TR011056 | Uniform Case Number: 22TR011056 | |
| Clerk File Date: 3/1/2022 | Status Date: 6/14/2022 | |
| SAO Case Number: | Total Fees Due: 0.00 | |
| Agency: ATLANTA POLICE DEPARTMENT | Agency Report #: 5938962- | Custody Location: |

### PARTIES

| TYPE | PARTY NAME | | ATTORNEY |
|---|---|---|---|
| DEFENDANT | MINTON, ROBERT | | MCCORMICK, CHRISTOPHER L (Main Attorney) |
| PLAINTIFF | CITY OF ATLANTA | | |

### CHARGES

| COUNT | DESCRIPTION | LEVEL | DEGREE | PLEA | DISPOSITION | DISPOSITION DATE |
|---|---|---|---|---|---|---|
| 1 | PEDESTRIAN DARTING OUT IN TRAFFIC (40-6-91(b)) | 2 | N | NOT GUILTY | BOUND OVER TO FULTON STATE COURT | |

### EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT |
|---|---|---|---|---|
| 6/16/2022 11:00 AM | STATUS | WARD, CHRISTOPHER EVAN | 3A | BOUND OVER |
| 5/17/2022 9:00 AM | ARRAIGNMENT | WARD, CHRISTOPHER EVAN | 3A | HELD - RESET |
| 5/17/2022 7:00 AM | ARRAIGNMENT | ATLANTA MUNICIPAL COURT JUDGE | CONV COURTROOM | RESET - NEW |

### CASE HISTORY

| CASE NUMBER | CHARGE DESCRIPTION | CASE STATUS | DISPOSITION | OUTSTANDING AMOUNT | NEXT EVENT | ALERTS |
|---|---|---|---|---|---|---|
| | | | No Additional Cases | | | |

### CASE DOCKETS

| DATE | ENTRY |
|---|---|
| 7/29/2022 | BOUND OVER CASE FILE DELIVERED |
| 6/14/2022 | BOUND OVER TO FULTON STATE COURT |
| 6/14/2022 | PLEA OF NOT GUILTY |
| 6/14/2022 | BIND OVER FORM GENERATED |
| 6/14/2022 | NOTICE OF CONFLICT |
| 6/7/2022 | ENTRY OF APPEARANCE/WAIVER OF ARRAIGNMENT AND REQUEST FOR JURY TRIAL/NOTICE OF INTENT TO PROCEED/CONSOLIDATED DEMANDS/CONSOLIDATED MOTIONS/LEAVE OF ABSENCE |
| 5/17/2022 | PLEA OF NOT GUILTY |
| 5/17/2022 | CASE RESET |
| 5/17/2022 | NOTICE TO APPEAR GENERATED |
| 5/17/2022 | RESET CASE |
| 4/26/2022 | NOTICE TO APPEAR GENERATED |
| 4/19/2022 | CASE RESET |
| 3/1/2022 | CASE FILED 03/01/2022 CASE NUMBER 22TR011056 |
| 3/1/2022 | TRAFFIC CITATION |

COMPLAINT EXHIBIT 2



**IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA**

**STATE OF GEORGIA**

VS                                                         FILE NO:   INT-003106-22

**Robert Minton**                                  OFFENSE DATE:   02/15/2022

DEFENDANT.                                                OTN:

## NOTICE OF CASE/CHARGE DISMISSAL – NOT ON DOCKET

The Office of the Solicitor General of the State Court of Fulton County hereby gives notice of dismissing the charge(s) listed below that were pending in the Office of Solicitor-General. Each charge was marked Not On Docket (i.e. dismissed) on 03/20/2023, for the following reason(s);

ACFB Resolved

The Solicitor-General will not be filing any Accusations on any charges listed on this Notice. This matter is closed.

**Charges: Pedestrian Darting Out In Traffic**

**Assistant Solicitor:**


*Keith E. Gammage*

Keith E. Gammage, Solicitor General

Office of Fulton County Solicitor-General
Suite J-301
160 Pryor Street
Atlanta, Georgia 30303
(404) 612-4800

# VAN SANT LAW, LLC

*NATIONALLY RECOGNIZED TRIAL LAWYERS*

Cumming Office:
123 Tribble Gap Road
Cumming, GA 30040

T: 770.886.9199
F: 770.886.9133

March 10, 2022

**VIA CERTIFIED MAIL:**
**70212720000123530180**
Mr. Andre Dickens
Mayor of Atlanta
55 Trinity Ave
Suite 5000
Atlanta, GA 30303

**VIA CERTIFIED MAIL:**
**70212720000123530166**
Rodney Bryant
Atlanta Chief of Police
226 Peachtree St. SW
Atlanta, GA 30303

**VIA CERTIFIED MAIL:**
**70212720000123530173**
Mr. Dustin Hillis
Atlanta Public Safety
Committee
55 Trinity Ave Suite 2900
Atlanta, GA 30303

**VIA CERTIFIED MAIL:**
**70212720000123530159**
Celeste Murphy
Deputy Chief of Police
226 Peachtree St. SW
Atlanta, GA 30303

Re:    **ANTI-LITEM NOTICE PURSUANT TO O.C.G.A. §36-33-5**

| | | |
|---|---|---|
| My Client | : | Mr. Robert Minton |
| Date of Accident | : | February 15, 2022 |
| Location of Accident | : | Centennial Olympic Park Dr NW |
| City Employee | : | Mr. B. Cruz |

Dear Sir/Madam:

On behalf of Mr. Robert Minton, the purpose of this correspondence is to put City of Atlanta on notice of a claim by said individual pursuant to O.C.G.A. §36-33-5. Mr. Minton was injured on February 15, 2022, at approximately 17:22. The incident occurred in the city of Atlanta at the interception of Centennial Olympic Park Drive NW and John Portman Boulevard NW after a collision with a vehicle owned by the City of Atlanta.

Based upon information and belief, it is our contention that City of Atlanta and its employee Mr. B. Cruz were grossly negligent while operating a city vehicle. In violation of O.C.G.A. 40-6-91 Right of way in crosswalks Mr. B. Cruz failed to stop and remain stopped to allow Mr. Robert Minton, a pedestrian, to cross the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling. As a direct and proximate result of your insured's gross negligence, our client suffered injuries, including but not limited to a broken foot. Our client continues to seek treatment for his injuries.

This will formally place City of Atlanta on notice of my client's claim for negligence, including, but not limited to, negligent hiring, negligent retention, and negligent supervision. We will be filing a claim against City of Atlanta up to the amount of $500,000.00. If you contend that this notice is in any way insufficient, please contact the undersigned within 10 days of your receipt.

With kind regards,

*Parker Van Sant*

C. PARKER VAN SANT
Attorney at Law

CPV/ar

# VAN SANT LAW, LLC

*NATIONALLY RECOGNIZED TRIAL LAWYERS*

Cumming Office:
123 Tribble Gap Road
Cumming, GA 30040

T: 770.886.9199
F: 770.886.9133

August 12, 2022

**VIA PRIORITY MAIL:**
**EI 447 631 133 US**
Mr. Andre Dickens
Mayor of Atlanta
55 Trinity Ave
Suite 5000
Atlanta, GA 30303

**VIA PRIORITY MAIL:**
**EI 447 631 147 US**
Rodney Bryant
Atlanta Chief of Police
226 Peachtree St. SW
Atlanta, GA 30303

**VIA PRIORITY MAIL:**
**EI 447 631 155 US**
Mr. Dustin Hillis
Atlanta Public Safety
Committee
55 Trinity Ave Suite 2900
Atlanta, GA 30303

**VIA PRIORITY MAIL:**
**EI447631120US**
Celeste Murphy
Deputy Chief of Police
226 Peachtree St. SW
Atlanta, GA 30303

*ALL WERE ALSO SENT VIA FEDEX OVERNIGHT

Re:   **ANTI-LITEM NOTICE PURSUANT TO O.C.G.A. §36-33-5**

|                      |   |                               |
|----------------------|---|-------------------------------|
| My Client            | : | Mr. Robert Minton             |
| Date of Accident     | : | February 15, 2022             |
| Location of Accident | : | Centennial Olympic Park Dr NW |
| City Employee        | : | Mr. B. Cruz                   |
| Governing Entity     | : | City of Atlanta               |

Dear Sir/Madam:

On behalf of Mr. Robert Minton, the purpose of this correspondence is to put the City of Atlanta on notice of a claim by said individual pursuant to O.C.G.A. §36-33-5. Mr. Minton was injured on February 15, 2022, at approximately 17:22. The incident occurred in the City of Atlanta at the interception of Centennial Olympic Park Drive NW and John Portman Boulevard NW after a collision with a vehicle owned by the City of Atlanta. We are seeking monetary damages in the amount of $450,000.

Based upon information and belief, it is our contention that the City of Atlanta and its employee Mr. B. Cruz were grossly negligent while operating a City vehicle. In violation of O.C.G.A. 40-6-91 Right of way in crosswalks, Mr. B. Cruz failed to stop and remain stopped to allow Mr. Robert Minton, a pedestrian, to cross the roadway within a crosswalk when the pedestrian is upon half of the roadway upon which the vehicle is traveling. As a direct and proximate result of your insured's negligence, our client suffered injuries, including but not limited to a broken foot. Mr. Minton is a diabetic which has severely limited his recovery and he

continues to suffer from the injuries he sustained on February 15, 2022. Our client continues to seek treatment for his injuries.

To date Mr. Minton's known medical expenses are as follows:

| | |
|---|---|
| Grady EMS | $  1,746.08 |
| Wellstar – Atlanta Medical Center | $ 78,102.83 |
| South Fulton Emergency Physicians | $  2,003.00 |
| Quantum Radiology PC | $  2,415.00 |

TOTAL MEDICAL EXPENSES    $ 84,266.91

This will formally place the City of Atlanta on notice of my client's claim for negligence, including, but not limited to, negligent hiring, negligent retention, and negligent supervision. We will be filing a claim against the City of Atlanta in the amount of $450,000.00. If you contend that this notice is in any way insufficient, please contact the undersigned within 10 days of your receipt.

With kind regards,

C. PARKER VAN SANT
Attorney at Law

CPVS/ar
(Enclosed: police report and listed medical bills)

COMPLAINT EXHIBIT 4



# CITY OF ATLANTA
## DEPARTMENT OF LAW

**ANDRE DICKENS**
Mayor

Suite 5000 ● City Hall Tower
55 Trinity Street, S.W., Atlanta, Georgia 30303-3520
**(404) 546-4100 MAIN**

**NINA R. HICKSON**
City Attorney

March 28, 2022

C. Parker Van Sant Esq.
Van Sant Law, LLC
123 Tribble Gap Road
Cumming, GA 30040

**City Claim No.:**22L0103 **Your Insured:** Robert Minton **Date of Incident:** 2/15/2022

Dear Mr. Sant,

The written communication which you recently submitted to the city for consideration has been forwarded to the undersigned for investigation and a report to Council will be rendered.

Upon the investigation being completed, a report of the findings and a recommendation of the City Attorney will be transmitted to the Council Committee on Public Safety and Legal Administration. If this committee acts favorably on the matter, it will be forwarded to the City Council for action. Should the City Council approve payment of the claim, we will be in touch with you. In the event that your claim receives an unfavorable recommendation, you will be notified of this action through the office of the Clerk of Council.

You are advised that the procedure above referred to is established by law and the acknowledgment of your written communication in no way waives the notice statute or the applicable Governmental Immunity statue. This office is unable to effect a modification of the procedure. Claims are processed through this office in the order received and all claims are processed as quickly as possible.

Please forward all future correspondence concerning this matter to the undersigned.

***Please note, we are currently experiencing claims processing delays due to COVID-19.***

Sincerely yours,

*Eric Williams*

Claims Investigator
EW/mh
Direct Dial # 404-546-4144
erwilliams@atlantaga.gov